**80 TALBOT AVE. REALTY CORP.**
vs.
**COMMONWEALTH
OF
MASSACHUSETTS**

**C.A. No. 9608**

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

**October 2, 1980**

plaintiff.
defendant.

## MEMORANDUM OF DECISION

In this contract action, the plaintiff alleges that the Commonwealth is indebted to it for failure to pay rent for the term of a lease of premises at 70 Talbot Avenue, Dorchester and for the value of the Commonwealth's use and occupancy of premises located at 80 Talbot Avenue, Dorchester.

Early in 1973, Freedom Industries, Inc. owned the premises located at 70-80 Talbot Avenue, Dorchester subject to a mortgage to the John Hancock Mutual Life Insurance Co. These two addresses consisted of a single, one-story cinder block building with a corrugated steel roof. The portion of the building located at 70 Talbot Avenue had most recently been used as a supermarket. It consisted of approximately 17,500 square feet of floor space, the front portion of which had a suspended ceiling and tile floor. The portion of the building located at 80 Talbot Avenue was completely finished and had been most recently used as a liquor store. In early 1973, however, the entire building was vacant, its exterior having suffered from some vandalism.

Early in the spring, 1973, Duane E. Sams, executive director of the Massachusetts Experimental School System, a subdivision of the Commonwealth's Department of Education, approached Archie Williams, the chief executive officer of Freedom Industries, to explore the possibility of leasing the premises at 80 Talbot Avenue. Sams told Williams that the Massachusetts Experimental School System needed space and was exploring possible sites in the area. Williams responded that, as the building had been most recently used as a supermarket, various shelving and refrigeration would have to be moved and that Freedom Industries did not have the funds to renovate the building for use as a school. Sams responded, "Don't worry. We can raise the money."

Sams confirmed his discussions with Williams in a letter dated April 4, 1973

where, among other things, he stated "Having had a contractor on the premises, we both agree that absolutely no structural change is required. In fact, the facility would remain intact as it is without even moving the counters and preparation areas. ... We will have to go through a standardized bidding procedure through Mr. George A. Luciano's Bureau of State Buildings. However, we can write the specifications in such a way that only the facility at 80 Talbot Avenue can meet our needs."

Evidently, the risks of public bidding troubled Williams since he asked Sams' associate, one Stephen Shaw, about it repeatedly. To his inquiries, Shaw stated on more than one occasion, in substance, "We're looking for a place near [Franklin Park]. [Franklin Park is directly across the street from 80 Talbot Avenue.] This is the building we want. We will draw the specs so you are probably the one who wins."

It appears that by mid-summer or earlier, the price term for a lease of the premises had been agreed upon. On June 17, 1973, the Commissioner of Education made a formal request to lease additional space for the Massachusetts Experimental School System. On July 26, 1973, the Bureau of State Buildings sent out a request for bids. Among the bidders was an entity called 80 Talbot Avenue Realty Corp.[1] The bids were opened on August 24, 1973. In addition to the 80 Talbot Avenue Realty Corp., there was one other bidder offering a site at 5 Rhoades Street, Dorchester with the same floor area and same rent. The premises at 70 Talbot Avenue were chosen by the Commonwealth's agents and a lease executed on October 1, 1973. Under its terms, this lease was to run for three years at an annual rental of $70,000 to be paid in equal monthly installments of $5,833.33.

Under the lease, it was the responsibility of the 80 Talbot Avenue Realty Corp. to "prepare the building for occupancy ... all in compliance with pertinent statutory regulations for use as an educational facility." Failure to "maintain the premises and all appurtenances thereto ... in reasonably good repair, reasonable wear and tear excepted," permitted a termination of the lease upon thirty days written notice. Further, if the Commonwealth were to "vote not to operate that experimental school, [sic] for the third year of the lease[,] then the lessee may terminate this lease by giving the lessor ninety days notice in writing". Although the building was occupied for the 1973 and 1974-1975 school years, the 80 Talbot Avenue Realty Corp. never secured a certificate of occupancy from the City of Boston. In September, 1973, Freedom Industries had been notified officially by the Building Department of the City of Boston that the premises at 70-80 Talbot Avenue were unsafe and a common nuisance. At once, an application for a building permit to correct these deficiencies was filed with the City by the "80 Talbot Avenue Realty Trust". Nothing was ever done to follow up this application, however, and when no response was made to the City's January 28, 1974 request for specific plans to effectuate the necessary improvements, the application was deemed by the City to have been abandoned.

The space leased proved cramped and Williams often saw students studying on the stairs at 70 Talbot Avenue. He was thus receptive to the proposal by Stephen Shaw to vacate the premises at 80 Talbot Avenue and lease those premises to the Commonwealth as well. Indeed, the original lease contemplated such an expansion of the leased premises.[2] The terms of such an additional lease were worked out between Williams and Shaw and Williams caused

[1] Actually, the articles of incorporation of this new entity were not finally filed with the Secretary of State until the day prior to the opening of the bids. 80 Talbot Avenue Realty Corp. was formed as a vehicle for accomplishing the lease of the premises. Upon the strength of an expected lease of the premises to the Massachusetts Experimental School System, Williams negotiated a loan from the Unity Bank & Trust Co. to the 80 Talbot Avenue Realty Corp., the proceeds of which he used to pay off the mortgage held by the John Hancock Mutual Life Insurance Co., in return for which Freedom Industries conveyed its ownership of the premises to the 80 Talbot Avenue Realty Corp.

[2] In relevant part, the lease provides that "should the Lessee require additional space during the term of this lease or the extension thereof, the Lessor will furnish such space as is required by the Lessee, if available, adjacent to space covered by this lease or connected thereto by corridors, the price to be not in excess of the rental paid per square foot for the space covered by this lease, and the term of such additional space to be concurrent with the balance of the period covered by this lease or the extension thereof."

80 Talbot Avenue (an area of approximately 8,000 square feet) to be vacated in October, 1973. This area was promptly occupied by the Massachusetts Experimental School System. Williams thought that he was dealing with authorized agents of the Commonwealth in making this arrangement; he knew that the Commissioner of Education had come down to visit the building and had seen that both 70 and 80 Talbot Avenue were being used together as a school. Indeed, Shaw told Williams not to "go downtown [i.e. to the Department of Education]. Work through me." He said that there was a "conflict" between the Massachusetts Experimental School System and the Department of Education and confided that, "People in the Department don't like black people doing what we're doing." I find that Williams relied upon these statements and never sought a written lease for the premises at 80 Talbot Avenue.

On April 28, 1975, the Board of Education of the Commonwealth voted not to fund the Massachusetts Experimental School System during fiscal year 1976 (commencing July 1, 1975) and to reduce its budget during the remainder of fiscal year 1975. The rental payment for the month of April, 1975 was the last such payment received by the plaintiff.

On May 30, 1975, the Boston Fire Department mailed to the "Experimental Model High School" located at 80 Talbot Avenue an abatement order requiring immediate correction of a variety of fire hazards detected upon a fire inspection of the school. One month later, on June 30, 1975, the City of Boston Building Department sent a violation notice to the "Exp. School System Comm. of Mass." pointing out the illegal occupancy of the building at 70 Talbot Avenue. The lessor not having corrected the violations complained of, the Commissioner of Education, acting pursuant to the terms of the lease, gave notice on August 13, 1975 that the lease would terminate thirty-one days from the date of his letter. A confirmatory communication was sent to the plaintiff by the Commissioner on September 18, 1975 asserting the position that the lease terminated as of September 15, 1975. The Commonwealth has paid no rent for the occupancy of the premises at 70-80 Talbot Avenue since April, 1975.

Wholly apart from any issue posed by the Statute of Frauds, the Commonwealth can lease premises outside of the State House or other building owned by it only by the action of the administrative head of the state department involved with the approval of the State Superintendent of Buildings, the Commissioner of Administration, and the Governor. G.L. c. 8, § 10A. The plaintiff first claims that he has such a lease with respect to the premises at 70 Talbot Avenue and that this lease, by its own terms and the agreement of the parties has been extended to cover 80 Talbot Avenue as well. I disagree. Section 10A of G.L. c. 8 expressly mandates the full approval process as a precondition of renewing any lease and I conclude that such process must be followed, whatever the lease terms, prior to any significant expansion in the area leased. "If any doubt remainted on the score of the meaning of the [statutory] language, one would be entitled to consider the functional suitability of the competing interpretations." Casasanta v. Zoning Board of Appeals, Mass. Adv. Sh. (1979) 86, 91-92. Here, the interpretation urged by the plaintiff would substantially weaken the internal controls devised by the Legislature and permit a department head to lease an approved small area for a long term and then expand his leased domain without effective review, thus obligating the Commonwealth for expenditures beyond those originally contemplated at the time of initial approval. The duty to interpret statutes "to the end that there may be a harmonious and consistent body of law," Randall's Case, 331 Mass. 383, 386 (1954), requires the result reached here.

Absent a written lease, the plaintiff claims it is entitled to recover for the use and occupancy of 80 Talbot Avenue. But whatever the authority of Stephen Shaw and however egregiously misleading his representations, it was Williams duty in contracting with the Commonwealth on behalf of 80 Talbot Avenue Realty Corp. to ascertain the authority of the public officer who purported to act for the Common-

wealth. Baker v. Commonwealth, 312 Mass. 490, 492 (1942). Having failed to do so, he cannot now claim that any of his discussions with Shaw created an enforceable contract concerning the premises at 80 Talbot Avenue since Shaw was without authority to act and there is no proof whatsoever that any of the other officials necessarily involved ever approved any such lease. Nor can the plaintiff recover as to these premises on any theory of implied or quasi-contract or restitution. Lewis v. Commonwealth, 332 Mass. 4, 6 (1954). Adalian Bros., Inc. v. Boston, 323 Mass. 632, 639 (1949). 1956 Op. Atty. Gen. 84 (April 2, 1956).

An apparently valid lease was executed with respect to the premises at 70 Talbot Avenue. The plaintiff here seeks to recover the rental due for the unexpired portion of the leased term. This issue is governed by the lease provisions, and since the lessor (the plaintiff here) failed to prepare the building for "occupancy . . . in compliance with pertinent statutory regulations for use as an educational facility" and thus did not "maintain the premises and all appurtenances thereto . . . in reasonably good repair" as required by the lease, I rule that the lease was properly terminated according to its terms on September 15, 1975.

This leaves the four and one-half months from May 1 through September 15, 1975 during which the Commonwealth occupied the premises at 70 Talbot Avenue pursuant to a written and properly approved lease and has paid no rent therefor. The Commonwealth raises two contentions with respect to this aspect of the claim. First, it asserts that the entire lease is invalid since the specifications were "rigged" to favor the plaintiff. Second, it asserts that the lease is invalid since the premises had already been identified as a common nuisance prior to the occupancy by the Commonwealth, the plaintiff not having informed the Commonwealth of this fact. Neither contention will withstand analysis.

The seminal case concerning the issue of the alleged illegality of the lease contract is Town Planning & Eng'r Assoc., Inc. v. Amesbury Specialty Co., Inc., 369 Mass. 737, 745-757 (1976). There the Supreme Judicial Court stated:

Our cases warn against the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found. As was said in Nussenbaum v. Chambers & Chambers, Inc., 322 Mass. 419, 422 (1948): 'Courts do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law.' . . . Professor Corbin adds: 'The statute may be clearly for protection against fraud and incompetence; but in very many cases the statute breaker is neither fraudulent nor incompetent . . . and the real defrauder seems to be the plaintiff who is enriching himself at the plaintiff's expense. Although many courts yearn for a mechanically applicable rule, they have not made one in the present instance. Justice requires that the penalty should fit the crime; and justice and sound policy do not always require . . . large forfeitures. . .' 6A A. Corbin, Contracts § 1512, at 713 (1962).

Further, the Court directed that, in considering the issue of illegality as invalidating a contract "all the circumstances are to be considered and evaluated: what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract . . .; what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall." Id. at 745-746. This has been the analysis followed in each of the subsequent cases in which this issue has arisen. City of Lawrence v. Falzarano, Mass. Adv. Sh. (1980) 571, 576. Young v. Southgate Development Corp., Mass. Adv. Sh. (1980) 131, 133. Valley Stream Teachers Federal Credit Union v. Commissioner of Banks, Mass. Adv. Sh. (1978) 3130. Harness Track Security, Inc. v. Bay State Raceway, Inc., Mass. Adv. Sh. (1978)

309, 313-314. See generally Restatement (2d) of Contracts §320 (Tent. Draft No. 12, 1977).

In the present case, the nature and substance of the contract were not illegal in any respect. The illegal behavior, if any, appears confined to officials of the Commonwealth. I find that the plaintiff in no way participated in drawing the specifications detailing the Commonwealth's needs for space. Indeed, it was agents of the Commonwealth who sought to assure the plaintiff that he would be the successful bidder in order to deter him from striking a bargain with another prospective lessee. Moreover, I find that the plaintiff did not conceal any defects in the leased premises and, while it may not have specifically informed the Commonwealth's agents of the receipt of the notice of a building violation in September, 1973, this was not a material omission in view of the Commonwealth's own knowledge of the condition of the premises. The alleged illegality was, at best, incidental to the actual performance of the contract. Indeed, prior to this litigation the Commonwealth raised no objection to the plaintiff's performance whatsoever. It terminated the contract only when the objections of municipal officials responsible for the enforcement of safety and building codes were brought to the Commonwealth's attention. While the strength of the public policy underlying the public bidding laws is significant, see **Interstate Eng. Corp. v. Fitchburg,** 367 Mass. 751, 757-758 (1975), requiring the Commonwealth to pay the rent it agreed upon for premises it actually used over a period of four and one-half months will not defeat that policy. Indeed, holding the sovereign to its solemn contractual obligations is more likely to cause it to institute the internal sanctions necessary to avoid bid rigging than would any policy of granting it an added windfall as a result of the sharp practice of its agents. Finally, as an equitable matter, I conclude that the plaintiff does not deserve to suffer a forfeiture nor does the Commonwealth deserve a windfall. In short, "the vector of considerations here points in the plaintiff's favor". **Town Planning & Eng'r Assocs., Inc. v. Amesbury Specialty Co., Inc.,** supra at 746.

The Commonwealth's claim that it was constructively evicted by the lessor's failure to correct deficiences that caused the building to be declared a common nuisance and by its failure to secure the necessary occupancy permits, may be dealt with briefly. The issue does not arise with respect to the Commonwealth's obligations to pay rent following the point at which it vacated the premises since I have already ruled that the leave was properly terminated as of mid-September, 1975, pursuant to its terms. The plaintiff relies on the old rules at law that "the tenant's abandonment of the leased premises must take place within a reasonable time ... after the acts alleged to constitute constructive eviction." **Charles E. Burt, Inc. v. Seven Grand Corp.,** 340 Mass. 124, 128-129 (1959) (Cutter, J.). See **Rome v. Johnson,** 274 Mass. 444, 450-451 (1931); **A.W. Banister Co. v. P.J.W. Moodie Lumber Corp.,** 286 Mass. 424, 426-427 (1934). The plaintiff argues that the occupancy of the premises for two full school years without complaint prevents the maintenance of a constructive eviction defense as matter of law. I need not resolve the issue since the Commonwealth has failed, in any event, to sustain the defense by any proof whatsoever that the lease was any less valuable to it by virtue of the acts claimed now to constitute a constructive eviction. **Charles E. Burt, Inc. v. Seven Grand Corp.,** supra at 130-131.

Accordingly, the Commonwealth is indebted to the plaintiff for rent for the four and one-half month period from May 1, 1975 — September 15, 1975. Judgment will enter for the plaintiff in the amount of $26,249.98 with costs, and statutory interest from October 1, 1975.

By the court
William G. Young
Justice of the Superior Court

1619 0577